United States District Court
Southern District of Texas
**ENTERED**
October 27, 2015
David J. Bradley, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MEMC PASADENA, INC., | § | |
| | § | |
| **Plaintiff,** | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-599 |
| | § | |
| GOODGAMES INDUSTRIAL | § | |
| SOLUTIONS, LLC, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Before the Court are the motion for summary judgment filed by Defendant Goodgames Industrial Solutions, LLC ("GIS"), (Doc. No. 54), and the motion for partial summary judgment filed by MEMC Pasadena, Inc., (Doc. No. 56). After carefully reviewing the parties' filings, the record, and the applicable law, the Court finds that MEMC's motion should be granted, and that GIS's motion should be denied in part and granted in part.

### I.   BACKGROUND

This case is about the disposal of waste generated by MEMC at the U.S. Oil Recovery Superfund Site (the "Site") in Pasadena, Texas. The following facts are undisputed.

MEMC produces ultra-pure granular polysilicon, which is the base material used to manufacture silicon wafers and other related products. (Doc. No. 1 ¶ 11.) The manufacturing process generates waste materials, the disposal of which is regulated by state and federal laws. (*Id.* ¶ 12.)

GIS "is an environmental consulting and waste management company." (Doc. No. 57, Ex. B.) While GIS began in 2002 as a consulting firm, it "has expanded its role into a complete environmental waste disposal and service company." (*Id.*) GIS is a single-member limited

liability corporation, and Van Goodgame is its sole member. (*Id.*, Ex. D.)

Beginning in late 2004, MEMC hired GIS to coordinate the disposal of it sodium silicate waste stream. (*Id.*, Ex. M; Doc. No. 55, Ex. 1 at 19.) GIS acted as a waste broker for this waste stream until 2009 or 2010. At that time, MEMC no longer required off-site treatment of its wastewater. (Doc. No. 55, Ex. 2 at 42–43.) As a waste broker, GIS facilitated the movement of waste from MEMC, as the waste generator, to an approved waste disposal facility. (*Id.*, Ex. 1 at 19; Doc. No. 57, Ex. M at 7.)

The approval process for waste disposal runs in two directions. The waste generator approves the disposal facility based on its evaluation of cost and the facility's ability to treat and dispose of the waste. (Doc. No. 55, Ex. 1 at 14 & Ex. 8.) The disposal facility approves the waste by receiving a sample to test for "composition, treatability, and compatibility with other waste streams." (*Id.*, Ex. 8 at 5.) As described in the following paragraphs, GIS facilitated both approval processes for MEMC and U.S. Oil Recovery LLC.

GIS suggested the U.S. Oil Site to MEMC as a disposal facility. (*Id.*, Ex. 1 at 19.) GIS informed MEMC of the costs associated with the Site. (*Id.*). GIS would receive a quote from U.S. Oil for disposal of a particular type of waste. GIS would then present a quote to MEMC with the costs for disposal and transportation, plus GIS's markup. For example, on September 10, 2004, GIS received a quote from U.S. Oil Recovery for disposal of MEMC's sodium silicate solution at $0.012 per pound, with a $150 minimum disposal, with various conditions applying to the price, such as the price being valid for forty-five days. (Doc. No. 59, Ex. DD.) On September 14, 2004, GIS provided a quote for disposal of sodium silicate solution to MEMC at $0.016 per pound, with a $200 minimum disposal charge, and the same conditions applying to the price, plus the additional condition of the price being subject to any applicable local, state,

and federal taxes. (*Id.*, Ex. Y at 4–5.) GIS's quote to MEMC also included transportation at $75 per hour. (*Id.* at 5.) Over the years, GIS provided MEMC with updated quotes for disposal of sodium silicate solution and quotes for other types of waste. (*Id.* at 6–13.)

When MEMC was unfamiliar with the reputation of a new potential disposal facility, MEMC's practice was to perform a site visit before it would use that facility. (Doc. No. 55, Ex. 3 at 37.) Mr. Goodgame organized MEMC's visit to the Site for an audit. (*Id.*, Ex. 7 at 30.) In October 2004, three MEMC employees performed an audit of the Site. (*Id.* at 32–33; *id.*, Ex. 8 ¶ 5.0.) After the audit, GIS sent MEMC the completed prequalification package for the Site. (*Id.*, Ex. 7 at 32–33; Doc. No. 57, Ex. M at 7.) MEMC had provided the prequalification form to GIS. (Doc. No. 55, Ex. 1 at 24.) GIS passed it along to U.S. Oil, U.S. Oil completed it and returned it to GIS, and GIS then submitted it to MEMC for its review. (Doc. No. 57, Ex. M at 7.) Ultimately, MEMC approved the Site for disposal. (Doc. 55, Ex. 2 at 32.)

When MEMC had waste that was approved to go to U.S. Oil, MEMC would contact Mr. Goodgame to schedule the waste to be transported there. (*Id.*, Ex. 1 at 36.) A MEMC engineer would call or email Mr. Goodgame to ask how many loads U.S. Oil could handle. (Doc. No. 57, Ex. E at 3–4.) Based on Mr. Goodgame's answer, a MEMC engineer would complete the manifest for transporting the waste. At MEMC's request, GIS provided MEMC with waste manifests with the information about the disposal site and the transporter completed. (*Id.*, Exs. E, O, Q, & S.) GIS would also pick up samples of the waste. (*Id.*, Ex. O; Doc. No. 63, Ex. 3 at 3.) In addition, GIS would contact a trucking company previously approved by MEMC and instruct it to pick up waste at MEMC at a particular time and day and deliver it to U.S. Oil. (Doc. No. 57, Ex. L; *id.*, Ex. D.)

U.S. Oil always dealt directly with Mr. Goodgame, not with MEMC. (*Id.*, Ex. G.) U.S.

3

Oil sent invoices to GIS, not MEMC. (*Id.* at 22; Doc. No. 59, Ex. Z.) GIS's accountant would receive these invoices and then create customer invoices for MEMC. (Doc. No. 57, Ex. H.) At least once, GIS's invoice to MEMC did not reference the name of the disposal facility at all and simply billed MEMC for transportation and disposal expenses. (Doc. No. 63, Ex. 1.) GIS marked up the disposal price when it invoiced MEMC. (*Id.*, Ex. 3.) The markup was at least 10% on the disposal price. (*Id.*) GIS's total markup on disposal and transportation costs ranged from 15% to 26%. (*Id.*, Exs. 3 & 20.) U.S. Oil considered GIS, not MEMC, its customer. (Doc. No. 57, Ex. G at 5.) Likewise, Mr. Goodgame once referred to GIS as U.S. Oil's customer when asking U.S. Oil to let GIS know about problems at the plant after U.S. Oil had contacted Bealine, a trucking company that had transported the waste. (*Id.*, Ex. G at 6.)

On one occasion in April 2007, U.S. Oil was unable to take a scheduled load of wastewater from MEMC due to a line break. (*Id.*, Ex. I.) Mr. Goodgame negotiated for U.S. Oil to pay the demurrage after the truck transporting MEMC's wastewater spent four hours waiting at U.S. Oil and another four hours going to a different facility. (*Id.*, Exs. I & N.) Mr. Goodgame informed MEMC via email that, because the U.S. Oil Site was backed up, "I am rerouting the Sodium Silicate to Texas Molecular," a different disposal facility. (Doc. No. 63, Ex. 9.) Mr. Goodgame further explained his plan to "check with US Oil on Tuesday to see how things are going and [when] they have breathing room, I will start back to US Oil. It could be as early as Wednesday." (*Id.*)

MEMC had the final authority to approve of a disposal facility. (Doc. No. 55, Ex. 1 at 14). Once GIS identified a potential facility, MEMC conducted its own evaluation of that option. (*Id.*, Ex. 1 at 22; Doc. No. 61, Ex. 11 at 24–25, 77.) In addition to pre-approving disposal facilities, MEMC decided where its actual waste would go. (Doc. No. 55, Ex. 1 at 54.) GIS did

not have the authority to choose a facility on MEMC's behalf. (*Id.*, Ex. 1 at 37; Doc. No. 61, Ex. 11 at 179–80, 188 & Ex. 15 at 50.)

On December 20, 2012, the U.S. Environmental Protection Agency Superfund Division sent GIS a letter about the Site. (Doc. No. 57, Ex. A.) The letter notified GIS that it "believes that [GIS] may be liable under Section 107(a) of [the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")] with respect to the Site as a person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person." (*Id.*)

On March 6, 2013, MEMC filed its complaint against GIS. (Doc. No. 1.) The complaint alleges eight claims for relief: contribution under Section 113 of the CERCLA, contribution under Sections 361.343 and 361.344 of the Texas Solid Waste Disposal Act ("TSWDA"), breach of contract, negligence/gross negligence, professional negligence, breach of fiduciary duty, negligent misrepresentation, and fraud/fraudulent misrepresentation. The complaint also seeks attorneys' fees, costs, and interest.

On July 20, 2015, the parties filed the motions now before the Court. GIS's motion seeks summary judgment on all claims. (Doc. No. 54.) MEMC's motion requests summary judgment only as to GIS's liability for contribution under CERCLA and TSWDA. (Doc. No. 56.) The parties filed responses to each other's motions. (Doc. Nos. 61 & 63.) MEMC also filed a reply. (Doc. No. 64.) The time for GIS to file a reply has passed. The motions are ripe for adjudication.

## II.   STANDARD OF REVIEW

A motion for summary judgment should be granted if no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.

5

P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those whose resolution "might affect the outcome of the suit under the governing law." *Willis v. Roche Biomedical Labs.*, 61 F.3d 313, 315 (5th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322–23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence that supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Nor will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the nonmoving party, and it cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.   LEGAL FRAMEWORK

In 1980, Congress enacted CERCLA "as a broad remedial measure aimed at assuring 'that those responsible for any damage, environmental harm, or injury from chemical poisons bear the costs of their actions.'" *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998), *as modified on reh'g* (Jan. 8, 1999) (quoting S. Rep. No. 96–848, at 13 (1980)). As a result, courts "are obligated to construe its provisions liberally in order to avoid frustrating Congress' intent." *Id.*

CERCLA provides two avenues for funding the cleanup of contaminated sites. "First, through the creation of the Hazardous Substance Response Trust Fund, or Superfund, CERCLA provides money to the federal government for waste site cleanup or for compensating other governmental or individual parties who have incurred response costs." *Id.* (citations omitted). Second, CERCLA allows private parties "to bring a cost-recovery action against 'responsible persons' for costs associated with responding to an environmental threat." *Id.*

"To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: (1) that the site in question is a 'facility' as defined in § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that a release or a threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the

plaintiff to incur response costs." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989), *as clarified on denial of reh'g* (Jan. 23, 1990). CERCLA imposes strict liability on responsible persons. *OHM Remediation Servs. v. Evans Cooperage Co.*, 116 F.3d 1574, 1578 (5th Cir. 1997).

CERCLA establishes four classes of responsible persons. 42 U.S.C. § 9607(a). These classes are as follows:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

*Id.*

Most important to this case is the third class, which is often referred to as arranger liability. Whether arranger liability "attaches is fact intensive and case specific." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 610 (2009).

CERCLA does not define "arranged for." Therefore, the phrase is given "its ordinary meaning." *Id.* at 611. The common meaning of "'arrange' implies action directed to a specific purpose," and Merriam–Webster's Collegiate Dictionary defines "arrange" as "to make preparations for: plan; to bring about an agreement or understanding concerning." *Id.* (alterations

omitted) (quoting *Merriam–Webster's Collegiate Dictionary* 64 (10th ed. 1993)). Relying on this

common meaning and dictionary definition, the Supreme Court held that "an entity may qualify

as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous

substance." *Id.*

## IV.   ANALYSIS

### A.  Arranger Liability under CERCLA and TSWDA

MEMC and GIS have filed cross-motions for summary judgment on the issue of GIS's

liability under CERCLA and TSWDA. By doing so, they in effect "concede there are no triable

issues of fact" related to this claim. *Uniroyal Chemical Co., Inc.v. Deltech Corp.*, 160 F.3d 238,

242 (5th Cir. 1998). Thus, the Court may proceed to determine the legal question of GIS's

liability based on the undisputed facts.

Only the second and fourth elements are at issue. The Court will first address response

costs (element four) before proceeding to the more difficult question of whether GIS is a

responsible person (element two).

#### 1.  Response Costs

GIS contends that MEMC has offered no evidence of its response costs. (Doc. No. 61 at

17.) Because incurring response costs is a necessary element to MEMC's contribution claim,

GIS asserts that MEMC cannot be awarded summary judgment. MEMC responds that it has paid

about $200,000 to the U.S. Oil Recovery Potentially Responsible Parties Group and nearly $1

million in legal fees. (Doc. No. 64 ¶ 8.)

The Court finds that MEMC has demonstrated that it has incurred some response costs.

Section 9607(a)(4)(B) imposes liability on responsible persons for, among other things, "any

other necessary costs of response incurred by any other person consistent with the national

contingency plan." In Exhibit 12 attached to MEMC's response to GIS's motion for summary judgment (Doc. No. 63), MEMC provided three invoices with its assessments from the U.S. Oil Recovery Site Potentially Responsible Parties Group. Also in Exhibit 12 are copies of the checks remitting payment. These documents show that MEMC has paid at least $186,959.10 in cleanup costs. Moreover, Exhibit 22 attached to MEMC's response establishes that MEMC has incurred $984,162.15 in legal fees related to the cleanup of the U.S. Oil Site and its litigation against GIS. Although it is unclear exactly what portion of these fees are recoverable as response costs, the Supreme Court has held that "some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response" and be recoverable. *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994).

MEMC has requested that the Court bifurcate its determinations of liability and response costs. GIS characterizes bifurcation as "extraordinary relief." (Doc. No. 61 at 17.) However, the Fifth Circuit has endorsed this approach. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667–68 (5th Cir. 1989) ("Bifurcation and the use of summary judgment provide efficient approaches to [CERCLA] cases by narrowing the issues at each phase, by avoiding remedial questions if no liability attaches, and by potentially hastening remedial action or settlement discussions once liability is determined.") Moreover, the Fifth Circuit has said that a "plaintiff is entitled to summary judgment on the liability issue . . . even when 'there is a genuine issue as to appropriate damages.'" *Id.* (quoting *United States v. Mottolo*, 605 F.Supp. 898, 902, 905 (D.N.H.1985)). Accordingly, the Court finds that MEMC has produced adequate evidence that it incurred some response costs such that this element is not a bar to summary judgment in its favor on the liability issue. Additionally, the Court finds that bifurcation is appropriate in this case.

### 2. Responsible Person

The Court now turns to the heart of the parties' dispute. The question is whether GIS is a responsible person as defined in § 9607(a)(3).

### a. Statutory Interpretation

Although not explicitly addressed by the parties, there is a threshold question of statutory interpretation that bears on GIS's liability. To reiterate, the first half of Section 9607(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity." The question of interpretation concerns what the phrase "by any other party or entity" modifies. A circuit split exists on this issue, and the Fifth Circuit has not yet expressed its view.

According to the First Circuit, "by any other party or entity" modifies "disposal or treatment." *Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 24 (1st Cir. 2004). Thus, arranger liability attaches only if the hazardous substances were disposed of or treated by a person or entity other than the purported arranger. *Id.* This interpretation also requires that a purported arranger "own[] or possess[]" the hazardous substances. To avoid "a loophole through which brokers and middlemen could escape liability," the First Circuit interpreted the term "possess" as including constructive possession of the waste. *Id.* at 25 ("When a broker arranges for the disposal of hazardous waste and it does so by exercising control over the waste, such control can amount to constructive possession of the waste.").

The Ninth Circuit has taken a different view. In *Pakootas v. Teck Cominco Metals, Ltd.*, it held that "by any other party or entity" modifies "of hazardous substances owned or possessed by such person." 452 F.3d 1066, 1082 (9th Cir. 2006). Consequently, arranger liability attaches

regardless of the purported arranger's ownership or possession of the hazardous substances. *Id.* (holding that parties "may be liable under § 9607(a)(3) if they arrange for disposal of their own waste or someone else's waste"). The Ninth Circuit noted its concern that following the First Circuit's interpretation "would leave a gaping and illogical hole in the statute's coverage, permitting argument that generators of hazardous waste might freely dispose of it themselves and stay outside the statute's cleanup liability provisions." *Id.* at 1081.

Neither reading fits comfortably with the statutory language. *See id.* ("Section 9607(a)(3) does not make literal or grammatical sense as written. It is by no means clear to what the phrase 'by any other party or entity' refers."). Because § 9607(a)(3) is ambiguous, CERCLA's purpose guides the Court's interpretation. *Exxon Corp. v. Hunt*, 475 U.S. 355, 371 (1986) ("[T]he overall purpose of a statute is a useful referent when trying to decipher ambiguous statutory language.")

One of CERCLA's purposes "is to shift the cost of cleaning up environmental harm from the taxpayers to the parties who benefited from the disposal of the wastes that caused the harm." *Matter of Bell Petroleum Servs., Inc.*, 3 F.3d 889, 897 (5th Cir. 1993). The Court finds that the Ninth Circuit's interpretation serves this purpose better than the First Circuit's. Under the First Circuit's view, a person who generates and disposes of waste without using a third party escapes liability solely because a third party was not involved. The Fifth Circuit has said that common sense is at the forefront of any statutory interpretation. *Burlington N. & Santa Fe Ry. Co. v. Poole Chem. Co.*, 419 F.3d 355, 364 (5th Cir. 2005). Given the statute's purpose, it would not make sense for CERCLA liability to turn on whether a generator used a third party to dispose of its waste. Surely a generator that disposes of its own waste "benefited from the disposal" as much, if not more, than a generator that hires a third party to take care of disposal.

The parties explicitly dispute a second question of statutory interpretation. The issue is

whether § 9607(a)(3) requires the arranger to have selected the site at which the waste was disposed. MEMC argues that an arranger need not have selected the site because § 9607(a)(4) expressly requires that transporters selected the site, but § 9607(a)(3) lacks a similar requirement. GIS disagrees, pointing to case law in support of its position.

The Fifth Circuit has already answered a very similar question. In *Uniroyal Chemical Co.*, the court considered whether the disposal requirement expressly "contained in three of the four classes of responsible persons" should be inferred as a requirement for the first class of responsible persons. 160 F.3d at 244. The court concluded that it would not depart from the plain meaning of § 9607(a)(1)'s express language, which "imposes liability on the owner or operator of a CERCLA facility without requiring a disposal." *Id.* at 250.

Likewise, § 9607(a)(4) expressly requires transporters to have selected the disposal site. *See* 42 U.S.C. § 9607(a)(4) (imposing liability on "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or *sites selected by such person*, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance") (emphasis added). Section 9607(a)(3) lacks a similar requirement. Therefore, in accordance with the *Uniroyal* analysis, the Court finds that an arranger, unlike a transporter, need not have selected the site to be held liable.

### b. *Geraghty & Miller* and the Nexus Test

Both parties rely on the so-called nexus test, drawn from *Geraghty & Miller v. Conoco Inc.*, 234 F.3d 917 (5th Cir. 2000), and other cases. In *Geraghty & Miller*, the Fifth Circuit held that, a purported arranger is liable only when there is "some nexus between that person's or entity's control and the hazardous waste contained in the facility." 234 F.3d at 928. A sufficient nexus exists when the arranger has "the obligation to exercise control over hazardous waste

disposal, and not the mere ability or opportunity to control the disposal." *Id.* (quoting *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 286 (2d Cir.1992) (emphasis omitted)).

However, the Fifth Circuit recognized in *Vine Street LLC v. Borg Warner Corp.* that *Geraghty & Miller* is no longer good law. 776 F.3d 312, 317 (5th Cir. 2015) ("After *Burlington Northern*, we have recognized that *Geraghty & Miller* is no longer controlling authority.") (citing *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 532 n.1 (5th Cir. 2010)). The *Vine Street* court then applied *Burlington Northern*'s intentional steps test rather than the "outdated nexus standard from *Geraghty & Miller*" that the district court had applied. *Id.*

Neither party mentions *Burlington Northern* or *Vine Street*. Nonetheless, those cases provide the current standard for determining arranger liability.

### c.   Intentional Steps Test

"Under *Burlington Northern*, the plaintiff must establish that the purported arranger took 'intentional steps to dispose of a hazardous substance.'" *Vine St. LLC*, 776 F.3d at 317 (quoting *Burlington Northern*, 556 U.S. at 611). *Vine Street* and *Burlington Northern* focused on the disposal aspect of arranger liability. In both cases, the purported arranger was found not liable based on two factors. First, the primary purpose of the transaction involved a useful product, and waste disposal was a mere peripheral occurrence. Second, the purported arranger did not intentionally dispose of the hazardous substance because it took steps to reduce the discharge.

Neither factor is present in this case. It is undisputed that the substance going to the U.S. Oil Site was waste and not a useful product. Moreover, the evidence in the record supports a finding that GIS intended that the waste be disposed. Waste disposal was the entire object of the interactions between MEMC, GIS, and U.S. Oil. In a letter to MEMC, GIS described its "main function" as "the facilitation of movements of your waste streams from your facility to an

approved disposal facility." (Doc. No. 57, Ex. M at 7.)

More than the disposal aspect of arranger liability, this case turns on what it means to "arrange for." As mentioned above, the Court in *Burlington Northern* adopted the ordinary meaning of "arrange" as "to make preparations for: plan; to bring about an agreement or understanding concerning." 556 U.S. at 611.

GIS's primary argument is that it lacked sufficient decision making authority over the disposal process to be held liable as an arranger. However, one can "plan" for something even when another party has the ultimate authority to decide. For example, wedding planners "make preparations" for weddings even though the bride and groom have the final say. Similarly, travel agents "plan" trips, but the final approval authority rests with the vacationers. Thus, the ordinary meaning "arrange" does not imply decision making authority.

Using this ordinary understanding of "arrange," the Court finds that GIS is an arranger. The following actions taken by GIS support this finding. GIS suggested the U.S. Oil Site, organized MEMC's site visit, coordinated the exchange of paperwork between MEMC and U.S Oil for the Site to be added to MEMC's approved contractor list, advised MEMC about the number of loads U.S. Oil could handle, delivered samples of MEMC's waste to U.S. Oil, contacted transporters to pick up MEMC's waste, received invoices directly from U.S. Oil, and sent invoices to MEMC with a 10–26% markup for GIS's services.

### 3.  TSWDA Liability

The parties agree that GIS's liability under the TSWDA rises and falls with its CERCLA liability. (Doc. No. 55 at 16–17; Doc. No. 57 at 7–8.) This is because Texas courts have looked to CERCLA when interpreting the TSWDA. *See R.R. St. & Co. v. Pilgrim Enter., Inc.*, 166 S.W.3d 232 (Tex. 2005). As a result, because the Court has found that GIS is liable under

CERCLA as an arranger, the Court likewise finds that GIS is liable under the TSWDA. *See Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 533 (5th Cir. 2010) ("Because we find that Eby is not liable as an arranger under CERCLA, we also find that it is not liable as an arranger under SWDA, the Texas 'counterpart' to CERCLA.").

### B.  Breach of Contract

GIS has also moved for summary judgment on MEMC's breach-of-contract claim. GIS's argument is twofold. First, GIS contends that there is no evidence that certain terms and conditions in purchase orders and other documents were part of a valid contract between MEMC and GIS. Second, GIS argues that there is no evidence that GIS breached those terms and conditions.[1] MEMC has not filed a cross-motion on this claim and instead submits that a genuine dispute of material fact precludes the entry of summary judgment.

"To recover for breach of contract, a plaintiff must show (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff suffered damages as a result of defendant's breach." *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "A legally enforceable contract consists of (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Id.*

---

[1] GIS offers a third argument that MEMC has not demonstrated any damages from the alleged breach. This argument is very similar to its argument that MEMC did not provide any evidence of response costs. MEMC, in turn, points to the same evidence—invoices and checks showing that it paid assessments for cleanup costs of the Site—as it did in controverting GIS's argument about response costs. The Court finds that this evidence overcomes GIS's argument regarding no evidence of damages.

Contract formation may be a question of law or fact, depending "on whether the parties' intent to be bound is unambiguously expressed on the face of the contract." *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 690 (Tex. App. – El Paso 2015, pet. denied). It is a question of law if the face of the agreement unambiguously demonstrates the parties' intent. *Id.* "However, if the parties' intentions as expressed in the document are indefinite and unclear, ambiguity exists, and the issues of contract formation and intent to be bound become questions of fact." *Id.*

The Court finds that MEMC has presented evidence to create a triable issue of fact as to contract formation. As to GIS's first argument, there is evidence in the record that MEMC's purchase orders incorporated by reference the terms and conditions and that GIS received these purchase orders and other notice of the terms and conditions. The purchase orders stated, "MEMC's Purchase Order Terms and Conditions are part of this agreement. Any additional or different terms proposed by vendor to this purchase order are rejected unless expressly agreed to by MEMC in writing. A copy of MEMC's Purchase Order Terms and Conditions is available at our website www.memc.com or by contacting the buyer." (Doc. No. 63, Ex. 4.) Charles Jones, a buyer at MEMC, testified as MEMC's corporate representative that purchase orders were faxed to GIS. (*Id.*, Ex. 14 at 35–36.) Moreover, the record contains an email from another MEMC buyer to Mr. Goodgame that states, "In the event of an order from MEMC, we shall require the attached MEMC Pasadena terms and conditions to govern the work performance." (Doc. No. 57, Ex. M at 4.)

Turning to breach, there are three relevant terms and conditions: Section 2, Warranty and Title, Section 13, Laws and Regulations, and Section 10, Indemnity. Section 2 states, in relevant part:

> Seller warrants . . . for the period ending one year from the date of acceptance, that the Work will be of high quality with workmanship and materials proper and sufficient for the purpose contemplated. . . . In the event that any portion of the Work has not been completely described in this Contract, it shall comply with nationally recognized codes and established industry standards.

(Doc. No. 63, Ex. 5 at 30.) The relevant portion of Section 13 states:

> Seller warrants that all goods delivered and services rendered hereunder will be produced and provided in compliance with all applicable federal, state, local and foreign laws and regulations, including, without limitation, all environmental, health and safety, and labor laws and regulations . . . . If any goods delivered or services provided hereunder constitute, include or use hazardous materials (as defined by any law, standard or practice), Seller warrants that Seller and its affected personnel understand the nature of and the hazards associated with the use, handling and transportation of such materials and will comply with all laws and regulations related thereto.

(Doc. No. 63, Ex. 5 at 32.)

GIS argues that there is no evidence that it breached Sections 2 or 13. In support, GIS cites the testimony from MEMC's expert witness, Beth Hebert. She testified that she was unaware of any non-compliance by GIS with nationally recognized codes and established industry standards or any law or regulation. (Doc. No. 55, Ex. 7 at 128–29.)

MEMC does not directly respond to GIS's argument. Instead, MEMC argues that GIS breached the warranty in Section 2 that "the Work will be of high quality." According to MEMC, GIS failed to provide high quality advice in suggesting the Site because MEMC is now paying for the Site's cleanup costs. As to Section 13, MEMC contends that GIS arranged for disposal of its waste at a facility when it knew that facility was having issues and would not pass an audit. MEMC supports this conclusion by citing an April 2007 email exchange between Mr. Goodgame and a U.S. Oil Recovery employee, Tom Starustka, in which Mr. Starustka admits that the Site would not pass an audit.

The Court finds that GIS is entitled to summary judgment on the breach-of-contract claim

for Sections 2 and 13 for two reasons. First, just like MEMC's expert witness, MEMC's response does not identify any specific nationally recognized code, established industry standard, law, or regulation that GIS has violated. That MEMC had to pay cleanup costs under CERCLA is no answer because CERCLA imposes strict liability on its four classes of responsible persons without regard to fault. *See Matter of Bell Petroleum*, 3 F.3d at 89 ("CERCLA, as a strict liability statute that will not listen to pleas of 'no fault,' can be terribly unfair in certain instances in which parties may be required to pay huge amounts for damages to which their acts did not contribute"); *Sea Lion, Inc. v. Wall Chem. Corp.*, 974 F. Supp. 589, 597 (S.D. Tex. 1996) ("CERCLA imposes strict liability without regard to fault or negligence."); Peter Manus, *To A Candidate in Search of an Environmental Theme: Promote the Public Trust*, 19 Stan. Envtl. L.J. 315, 335 (2000) (noting that under CERLA, "individual defendants who have broken no law but nevertheless have contributed to a pollution event may bear the entire financial burden of cleanup, at least in theory"). CERCLA liability hinges on status, not culpability. The fact that the Site has become contaminated with hazardous substances does not necessarily mean that GIS violated a nationally recognized code, established industry standard, law, or regulation.

Second, the 2007 email exchange does not support MEMC's claim. Although Mr. Starustka says in his emails that the Site is having problems with a backlog of inventory and could not pass an audit, nothing in the exchange indicates that GIS had MEMC's waste sent to the Site after learning of these problems. Rather, Mr. Goodgame's last email says, "Good luck and let us know when you are back up and running." (Doc. No. 59, Ex. AA.)

The final alleged breach involves Section 10. Two relevant parts of this indemnity provision are that it applies only "[i]n the event any Work is performed by Seller on MEMC's premises" and does not apply to "loss, damage, costs and expenses which are the direct result of

19

the sole negligence of MEMC." (Doc. No. 63, Ex. 5 at 31.) GIS makes one factual and two legal arguments about this section: that GIS did not perform any work on MEMC's premises, that Section 10 is unenforceable under the express negligence doctrine, and that Section 10 fails the conspicuousness requirement. MEMC responds that Mr. Goodgame visited MEMC to pick up samples of waste and drop off bills of lading, and that the transportation that GIS scheduled and invoiced involved picking up waste from MEMC's premises. MEMC further responds that the express negligence doctrine only applies to indemnity provisions indemnifying the indemnitee's own negligence, which Section 10 does not do. Finally, MEMC submits that Section 10 is conspicuous.

The Court agrees with MEMC. MEMC has presented sufficient evidence, through the testimony of David Sanders, a MEMC employee, and Tom Starustka, a U.S. Oil Recovery employee, as to Mr. Goodgame's visits to MEMC to create a factual dispute regarding GIS's work being performed on MEMC's premises. (Doc. No. 63, Exs. 13 and 14.) Moreover, the express negligence test established by the Supreme Court of Texas states that "[p]arties seeking to indemnify *themselves* for their own negligence must express that intent in specific terms." *Fisk Elec. Co. v. Constructors & Associates, Inc.*, 888 S.W.2d 813, 814 (Tex. 1994) (citing *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 708 (Tex. 1987)) (emphasis added). Here, MEMC's claim relates to GIS's alleged negligence, not MEMC's.

In discussing conspicuousness, the Supreme Court of Texas has held that "language in capital headings, language in contrasting type or color, and language in an extremely short document, such as a telegram, is conspicuous." *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex. 1993). Indemnity provisions "not hidden under a separate heading or surrounded by unrelated terms" may also be conspicuous. *Id.* (discussing *Enserch Corp. v.*

*Parker*, 794 S.W.2d 2, 9 (Tex. 1990)). However, provisions "located on the back of a work order in a series of numbered paragraphs without headings or contrasting type" are not conspicuous. *Id.* Here, the indemnity provision is identified with a heading in capital letters and appears in a separately numbered paragraph without unrelated terms in it. Accordingly, the Court finds that Section 10 is conspicuous.

In sum, the Court will grant GIS's summary judgment motion on the breach-of-contract claim related to Sections 2 and 13, but deny the motion as to Section 10.

### C.  Other State-Law Claims

Lastly, GIS has moved for summary judgment on MEMC's other state-law claims for negligence, professional negligence, gross negligence, breach of fiduciary duty, negligent misrepresentation, fraud, and fraudulent misrepresentation. The Court finds that GIS's motion on these claims should be granted.

For the three negligence-related claims, GIS met its initial burden by pointing to the absence of evidence that it owed MEMC a duty. MEMC's response fails to satisfy its burden to offer evidence to support this essential element of these claims. Rather, MEMC makes the conclusory allegation that "GIS owed MEMC a duty to use reasonable care in its handling of MEMC's waste." Its sole citation is to a district court opinion reciting that a plaintiff alleged that a defendant failed to use reasonable care in the delivery of hazardous substances. (Doc. No. 63 at 29 (citing *Differential Dev.-1994, Ltd. v. Harkrider Distrib. Co.*, 470 F. Supp. 2d 727, 731–32 (S.D. Tex. 2007)). The court did not review that claim on the merits and simply declined to exercise jurisdiction over it after. At this stage, MEMC's response is insufficient. Accordingly, GIS's motion as to the negligence-related claims must be granted.

On the negligent misrepresentation, fraud, and fraudulent misrepresentation claims, GIS

points to the lack of evidence that MEMC detrimentally relied on GIS's representations because MEMC conducted its own independent evaluation of the site. MEMC offers no response to this issue. Because MEMC has not identified any specific evidence showing that it detrimentally relied on GIS's representations, GIS's motion as to these claims must also be granted.

On the claim for breach of fiduciary duty, Texas law requires that, "[t]o impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998). GIS asserts that no evidence has been offered to show that GIS and MEMC had a pre-existing relationship to the logistical support GIS provided for transporting MEMC's waste to the Site. MEMC responds, "MEMC and GIS developed a relationship of confidence and trust" over the course of their relationship, during which "GIS managed MEMC's waste from 2004 to 2010." (Doc. No. 63 at 26.) MEMC does not cite to any evidence supporting this conclusory allegation. Moreover, MEMC's and GIS's dealings from 2004 and 2010 are the basis of this suit. Therefore, GIS's motion as to this claim must be granted.

## V.    CONCLUSION

For the reasons above, MEMC's motion for partial summary judgment is **GRANTED**, and GIS's motion for summary judgment is **DENIED IN PART AND GRANTED IN PART**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 27th day of October, 2015.

_____
THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

22